IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IRA LEE WILKINS, | ) |
|     Plaintiff, | ) ) ) |
| v. | ) ) Case No. 19-CV-069-TCK-JFJ |
| CITY OF TULSA, OKLAHOMA, OFFICER WILL MORTENSON, OFFICER ANGELA EMBERTON, and OFFICER EDEL RANGEL, | ) ) ) ) ) ) |
|     Defendants, | |

**OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment filed by defendants City of Tulsa, Oklahoma, Officer Will Mortenson, Officer Angela Emberton and Officer Edel Rangel. Doc. 49. Plaintiff Ira Lee Wilkins opposes the motion. Doc. 57.

**I. INTRODUCTION**

This lawsuit arises from the February 5, 2017 arrest of Plaintiff for Felony Assault and Battery of a Police Officer, Felony Actual Physical Control of a Motor Vehicle While Under the Influence of Alcohol (Second Offense), and misdemeanor resisting arrest. The arrest was conducted by City of Tulsa police officers after Tulsa dispatch advised them of a disturbance at Jackie Cooper Imports at 9393 S. Memorial Drive in Tulsa, Oklahoma.

Wilkins' Complaint asserts claims for excessive use of force in violation of 42 U.S.C. §1983 against the City of Tulsa ("City") and Officers Will Mortenson, Angela Emberton and Field Training Officer Edel Rangel, and a claim for municipal liability against the City. Doc. 2 at 6-7.

In their Motion for Summary Judgment, the individual officers contend they are entitled to the complete defense of qualified immunity, and the City claims it is entitled to summary judgment

because Plaintiff cannot prove an underlying constitutional violation, nor that any City policy, custom or practice was the moving force behind the alleged constitutional violation.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party opposing a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

A movant that "will not bear the burden of persuasion at trial need not negate the nonmovant's claim, "but may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal citations omitted). If the movant makes this prima facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and

may not escape summary judgment in the mere hope that something will turn up at trial. The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (internal citations omitted).

### III. MATERIAL FACTS

#### A. Tulsa Police Department Training

After graduating from the Tulsa Police Academy, Officers-in Training ("OITs") complete approximately 14 to 16 weeks of Field Training. *Id.*, Ex. 2; Mortenson Dep., 10:18-24; 11:3-9; Ex. 3, Emberton Dep., 12:2-12. Any officer who wishes to become a certified Field Training Officer ("FTO") must apply for the assignment, be approved by their chain of command, interview for the position and receive additional training. Doc. 49, Ex. 1, Rangel Dep., 10:2-11:16.

During Field Training, OITs complete a rotation through the three geographic patrol divisions across the City: Gilcrease Division, Riverside Division and Mingo Valley Division (collectively "FTO's"). In Phase 1, they are assigned to one of the FTO's for six weeks. In Phase 2, they rotate to another FTO for four weeks, and in Phase 4, OITs return to their first FTO for a final two weeks of field training. *Id.*, Rangel Dep., 13-6-14:2.

As of February 5, 2017, Officer Rangel had completed 971 hours of training, including 752 hours of training at the Tulsa Police Academy and 24 hours of Field Training Officer ("FTO") training; OIT Mortenson had completed 845 hours of training, including 837 hours of training at the Tulsa Police Academy; and Officer Emberton had completed 1209 hours of training, including 1056 hours at the Tulsa Police Academy. Doc 49, Exs. 9-11. Rangel, Mortenson and Emberton CLEET Profiles.

### B. February 5, 2017 Incident

On February 5, 2017, Officer Mortenson—then Officer in Training ("OIT") Mortenson—was assigned to Field Training Officer ("FTO") Edel Rangel. Doc. 49, Ex. 1, Rangel Dep., 12:24-13:5; Ex. 2, Mortenson Dep, 11:3-22. At approximately 12:30 a.m., OIT Mortenson and FTO Rangel were assigned to investigate a "disturbance" at Jackie Cooper Imports at 9393 S. Memorial Drive in Tulsa. *Id.*, Ex. 4, Tracis Report at 2. The report had been called in by a security officer, Christopher Morris. *Id*., Ex. 4, COT 0008.

Officer Angela Emberton was assigned as the backing officer to assist FTO Rangel and OIT Mortenson. *Id.*, Ex. 3, Emberton Dep., 68:21-69:10. When the officers arrived on the scene, they observed a man—later identified as Plaintiff—in the driver's seat of his vehicle in the Jackie Cooper Import parking lot. The vehicle was running and the radio was blaring. Ex. 2, Mortenson Dep. at 104:2-15; Ex. 4, TRACIS Incident Report, COT 0008.

All three officers testified that they smelled the odor of alcoholic beverage on Plaintiff's breath/person. *Id.*, Ex. 1, Rangel Dep. at 45:24-25; 46:5-8; Ex. 2, Mortenson Dep. at 89:1-16; Ex. 3, Emberton Dep. 63:22-25.[1] OIT Mortenson noted in the Tracis Report that "Wilkins speech was unintelligible" and that he "could smell the presence of an alcoholic beverage upon his person/breath." *Id.*, Ex. 4, TRACIS Incident Report.

OIT Mortenson ordered Plaintiff to exit his vehicle, as reasonable suspicion existed that Plaintiff was committing the crime of Actual Physical Control of a Vehicle while Intoxicated. Ex.

---

1 FTO Rangel and OIT Mortenson both testified that when they approached Wilkins' vehicle, they saw a bottle of alcohol on the floorboard of Plaintiff's vehicle. *Id*., Ex. 1, Rangel Dep. at 37:10-, 39:9-11; Ex. 2, Mortenson Dep. at 20:9-22. *See also* Ex. 4, TRACIS Incident Report, COT 0008. Plaintiff disputes this, pointing out that the Rangel bodycam video does not show a bottle anywhere in his car.

4

1, Rangel Dep., 45:12-15, 46:14-47:4. After Plaintiff exited his vehicle, OIT Mortenson handcuffed him and then attempted to search him. Ex. 4, TRACIS Incident Report, COT 0008.

Video from Officer Rangel's body camera shows OIT Mortenson and Officer Emberton struggling to hold Plaintiff still, and OIT Mortenson repeatedly telling Plaintiff to stop "flexing up." Rangel BodyCam Footage, pt. 1 at 2:20-27. OIT Mortenson testified that "[d]uring the entirety of the incident—so far, I was unable to complete a full search of him, so I was unable to know if he had a firearm on him or any kind of weapon that he was trying to access in resisting by trying to pull away, flex up, tense so that we could not locate the weapon. There was a possibility he could hurt us with a weapon because he's not fully searched." Doc. 49, Ex. 2, Mortenson Dep., 62:22-63:5. OIT Mortenson testified that officers feared Plaintiff might have a weapon in his back right pocket, *Id.*, Ex. 2, Mortenson Dep., 105:3-23. Both OIT Mortenson and Officer Emberton testified that Plaintiff kept trying to grab OIT Mortenson's hand while OIT Mortenson was searching him. *Id.*, Ex. 2, Mortenson Dep. at 62:22-63:5; Ex. 3, Emberton Dep. at 40:3-22. Officer Rangel also testified that Plaintiff was using his legs as leverage to attempt to push off from the car. Ex. 1, Rangel Dep., 55:9-56:8. In order to gain control of Plaintiff, the three officers—led by FTO Rangel—took Plaintiff to the ground. *Id.*, Ex. 1, Rangel Dep., 53:6-14; 55:2-56:18; Ex. 2, Mortenson Dep., 62:19-20; Rangel BodyCam Footage, pt. 1 at 3:30-3:55; Ex. 4, TRACIS Incident Report COT 0008.

Officer Emberton testified that after he was taken down, Plaintiff continued "trying to stand with us on him and continued to move—moving away from . . . officers." *Id.*, Ex. 3, Emberton Dep. at 18:1-5. Likewise, OIT Mortenson testified that Plaintiff continued to resist, grabbing OIT Mortenson's fingers and attempting to stand. *Id.*, Ex. 2, Mortenson Dep. at 66:25-67: 1-6, 15-17,

23-24. The bodycam video appears to confirm the officers' testimony. Rangel BodyCam Footage, pt. 1 at 4:03-4:38.

FTO Rangel then ordered OIT Mortenson to deploy his OC spray,[2] and OIT Mortenson deployed a one-second burst of the spray to Wilkins' face. *Id.* at 4:39-4:42. Officer Mortenson testified that Plaintiff stopped resisting officers only after the deployment of the OC spray. Ex. 2, Mortenson Dep at 111:1-7. Thereafter, the officers contacted EMSA to medically evaluate Plaintiff for the OC Spray. Ex. 4, TRACIS Incident Report, COT 008.

### C. TPD Policies

TPD Policy requires that all detainees be handcuffed behind their backs until booked into jail, and officers are responsible to ensure that their detainee has been thoroughly searched. Ex. 6, TPD Procedure Use of Force, 31-101A. The purpose of using OC Spray, as set out in the TPD Procedure Use of Force, is to neutralize an aggressive situation without the additional escalation of force in order to decrease the chance of injury to officers, suspects, and others. Doc. 49, Ex. 7, TPD Procedure use of OC Spray, 31-101D.

### D. Expert Report of John J. Ryan

Whether a resisting suspect is handcuffed or not, it is essential that the officer maintain control of the suspect for the safety of the officer, the suspect and anyone else in the area. *Id.*, ¶109. Ex. 8, John Ryan Expert Report ("Ryan Report"). In order to limit the suspect's mobility, the most common tactic used by officers is to take the suspect to the ground until the resistance can be controlled or overcome. *Id.*, ¶103. Officers throughout the United States are trained with respect to the danger of going hands on with a violent subject, and "[i] is recognized that close-

---

2 Oleoresin capsicum or "pepper spray"—better known as "pepper spray"—is derived from the cayenne pepper plant.

quarter, hands on conduct with a violent and unpredictable subject brings the officer's weapon within the reach of the subject and increases the level of danger to anyone in the area of the event." *Id.*, ¶109. Ryan further states that he has "reviewed cases where a subject handcuffed behind their back was able to grab a weapon and fatally shoot the officer." *Id.*

OC spray causes an immediate but temporary inflammation of the eyes and breathing passages without causing permanent physical injury of a subject that is actively and physically resisting or causing imminent danger to an officer. *Id.*, ¶107.

The Commission on Accreditation of Law Enforcement Agencies ("CALEA") reviews departments to determine if the agencies have met the policy, training and performance directives required for accreditation. Ex. 8, Ryan Report, ¶36. The Tulsa Police Department meets the highest standards in law enforcement set by CALEA. *Id*. Of the nearly 18,000 law enforcement agencies nationwide, less than a thousand have achieved CALEA Accreditation, much less the advanced status that TPD has consistently achieved. *Id.*, ¶90

Ryan opined that the actions the three officers "in approaching, detaining, investigating and taking custody of Mr. Wilkins was consistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations. *Id.,* ¶91.

### IV. ANALYSIS

#### A. Plaintiff's Fourth Amendment Claim

The Supreme Court has made it clear that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness" standard, rather than under a 'substantive due process" approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth

7

Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. *Id.*, citing *Tennessee v. Garner*, 417 U.S. 1, 8 (1985).

### 1. Qualified Immunity

Claims against police officers in their "individual capacity" are subject to the defense of qualified immunity. Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (quoting *Butz v. Economou*, 438 U.S. 478, 504-506 (1978)). And because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

"After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, and the plaintiff must first establish that the defendant's actions violated a constitutional or statutory right. . . . If a favorable view of the facts alleged show the violation of a constitutional right, the next sequential step is to ask whether the right was clearly established' at the time of the defendant's unlawful conduct. When the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity.

In *United States v. Windom*, the Tenth Circuit stated, "[W]e have held that 'the governmental interest in the safety of officers *outweighs* the individual's Fourth Amendment interest when an officer has an objective basis to believe that the person being lawfully detained is armed and dangerous.'" 863 F.3d 1322, 1331 (10th Cir. 2017) (emphasis in original) (quoting *United States v. King*, 990 F.2d 1552, 1561) (10th Cir. 1993). "Indeed, when an officer has a reasonable belief that a suspect he is investigating at close range is armed, 'it would appear to be

8

clearly *unreasonable* to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon to neutralize the threat of physical harm." *Id.* (emphasis in original) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)).

"In evaluating whether the precautionary steps taken by an officer [during a stop] were reasonable, the standard is objective—would the facts available to the officer at the *moment of the seizure* warrant a man of reasonable caution in the belief that the action taken was appropriate." *United States v. Mosley,* 743 F.3d 1317, at 1328-29) (10th Cir. 20140) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).

Additionally, the Tenth Circuit has long held that police officers, when executing a felony stop, may be permitted to force a detainee to the ground. *Windom*, 863 F.3d at 1329-30; *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007); *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).

Here, the officers were responding to a call by a security officer reporting an individual asleep in the driver seat of a running vehicle in a car dealership parking lot. The security officer had tried unsuccessfully to wake the individual. When officers arrived, Plaintiff was still asleep in the driver seat of his vehicle, the engine was running and the radio was playing loudly. Officers smelled alcohol on Plaintiff's breath when he exited the car. The video establishes that after Plaintiff was handcuffed, and while OIT Mortenson was trying to search his pockets, Plaintiff continued to move around, despite OIT Mortenson's repeated orders to "stop" and "stop flexing up on me." Accordingly, the Court concludes that, in light of Plaintiff's failure to heed the officers' commands that he stop flexing and moving around, the takedown of Plaintiff was reasonable. Further, the Court finds that—once on the ground—Plaintiff's continued movement and resistance

9

justified Officer Rangel in ordering OIT Mortenson to deploy the OC spray and OIT Mortenson in following that command.

Accordingly, the Court finds that Officers Rangel, Emberton and Mortenson have properly invoked the complete defense of qualified immunity, and are therefore entitled to summary judgment on Plaintiff's 42 U.S.C. §1983 claim against them for use of excessive force.

Having so found, the Court further concludes the City is entitled to summary judgment on Plaintiff's §1983 claim against it for use of excessive force.

### 2. Municipal Liability

Plaintiff's Complaint alleges "an affirmative link between the deprivation of Plaintiff's constitutional rights and TPD policies, practices and/or customs which the city promulgated, created, implemented and/or possessed responsibility for." Doc. 2, Complaint, ¶50. The Court's grant of summary judgment in favor of the officers and the City on Plaintiff's §1983 claims, renders Plaintiff's claim for municipal liability untenable. Accordingly, the City's motion for summary judgment on Plaintiff's municipal liability claim is granted.

### V. CONCLUSION

Defendants' Combined Motion for Summary Judgment (Do. 49) is hereby granted.

ENTERED this 7th day of June, 2021.

_____
TERENCE C. KERN
United States District Judge